[No. B155804. Second Dist., Div. One. July 22, 2003.]

BARRY B. KAUFMAN et al., Plaintiffs and Appellants, v.
ACS SYSTEMS, INC., et al., Defendants and Respondents.

[No. B156082. Second Dist., Div. One. July 22, 2003.]

DAVID L. AMKRAUT et al., Plaintiffs and Appellants, v.
FAX.COM, INC., et al., Defendants and Respondents

**COUNSEL**

Connon & Wood, Nicholas P. Connon; Zimmermann, Koomer, Connolly & Finkel and Scott Z. Zimmermann for Plaintiffs and Appellants Barry B. Kaufman and Vans, Inc.

Harvey Rosenfield and Pamela M. Pressley for The Foundation for Taxpayer and Consumer Rights as Amicus Curiae on behalf of Plaintiffs and Appellants Barry B. Kaufman and Vans, Inc.

Jamie R. Schloss for Plaintiffs and Appellants David L. Amkraut and Joel Amkraut.

John D. Ashcroft, United States Attorney General, Robert D. McCallum, Jr., Assistant Attorney General; Debra W. Yang, Mark Stern, Alisa B. Klein and Kathleen Kane for the United States of America as Amicus Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Herschel T. Elkins, Assistant Attorney General, Ronald A. Reiter and Seth Mermin, Deputy Attorneys General, for the State of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Wright, Robinson, Osthimer & Tatum, Charles H. Horn, Brian S. Inamine, Donald L. Mabry and Philip J. Bonoli for Defendants and Respondents ACS Systems, Inc., and Micro General Corporation.

Epstein Turner & Song, David B. Epstein and Daniel J. Kolodziej for Defendants and Respondents DataMart Information Services Corporation and Joe Girdwood.

David B. Felsenthal; Law Offices of Nate G. Kraut and Nate G. Kraut for Defendant and Respondent Fax.com, Inc.

Case, Ibrahim & Clauss and Brian C. Case for Defendant and Respondent Cynet, Inc.

## Opinion

**MALLANO, J.**—In this appeal we determine the applicability and constitutionality of a federal statute that restricts unsolicited facsimile (fax) advertisements, commonly called "junk fax." The federal Telephone Consumer Protection Act of 1991 (TCPA or Act) (Pub.L. No. 102-243, § 3(a) (Dec. 20, 1991) 105 Stat. 2395) prohibits the sending of unsolicited advertisements to fax machines. Anyone receiving such a fax may, "if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State ... [¶] ... an action [seeking injunctive relief and actual monetary loss or $500 in damages, whichever is greater, plus treble damages for willful or knowing violations]." (47 U.S.C. § 227(b)(3)(A)–(C).)

The trial court ruled that plaintiffs could not pursue a TCPA claim in state court because the California Legislature had not enacted a statute expressly permitting such a claim. The trial court also ruled that the TCPA is constitutional and that TCPA claims may be brought as a class action. We agree with the trial court's resolution of the constitutional and class action issues but conclude that a TCPA action may be maintained in state court because the California Legislature has not prohibited such suits. We reverse.

### I

### BACKGROUND

We begin with an examination of the TCPA's legislative history, followed by the procedural history of the case.

### A. *Legislative History*

From 1989 to 1991, Congress considered 10 bills addressing the telemarketing practices made possible by technological innovations, including the transmission of advertisements by fax. In the process, Congress held three hearings and produced three committee reports. The final bill combined features of three bills.

In drafting the bills, Congress became aware of problems associated with unsolicited fax advertisements—problems that were highlighted in several media reports and by legislative initiatives in many states. (See Telemarketing Practices: Hearing before House Com. on Energy and Commerce, Subcom. on Telecommunications and Finance, on H.R. Nos. 628, 2131, and 2184, 101st Cong., 1st Sess., pp. 54–57 (1989); H.R.Rep. No. 102-317, 1st Sess., p. 25 (1991).) "Since businesses [had] ·begun to express concern about the interference, interruptions and expenses

that junk fax ... placed upon them, states [were] taking action to eliminate these telemarketing practices. [Two states had] enacted laws banning the use of facsimile machines for unsolicited advertising. Similar bills [were] ... pending in the legislatures of about half the states." (H.R.Rep. No. 102-317, *supra*, at p. 25.)

"[State laws] had limited effect, however, because States do not have jurisdiction over interstate calls. Many States ... expressed a desire for Federal legislation to regulate interstate telemarketing calls to supplement their restrictions on intrastate calls." (Sen.Rep. No. 102-178, 1st Sess., p. 3 (1991), reprinted in 1991 U.S. Code Cong. & Admin. News, p. 1970.) "[B]usiness owners [were] virtually unanimous in their view that they [did] not want their fax lines tied up by advertisers trying to send messages." (Telemarketing Practices: Hearing before House Com. on Energy and Commerce, Subcom. on Telecommunications and Finance, on H.R. Nos. 628, 2131, and 2184, *supra*, at pp. 54–55, fn. omitted.) "Extensive research ... revealed no case of a company (other than those advertising via fax) which oppose[d] legislation restricting advertising via fax." (*Id.* at p. 54, fn. 35.) As a state legislator from Utah put it, " 'You get a message you didn't want from people you don't know on paper they didn't buy.' " (*Id.* at p. 54 (statement of Representative Ken Jacobsen).)

Richard Kessel, a New York state official, spearheaded the movement to ban unsolicited fax advertisements in his state after he was unable to fax a document to the governor's office which, at the time, was processing an incoming advertisement. (See Telemarketing Practices: Hearing before House Com. on Energy and Commerce, Subcom. on Telecommunications and Finance, on H.R. Nos. 628, 2131, and 2184, *supra*, at p. 55.) " 'The last thing you want when you're trying to meet a deadline, or trying to get a memo to your boss ... is to be disturbed by someone trying to sell draperies or submarine sandwiches.' " (*Ibid.*)

In hearings held in 1991, the cofounder of the Center for the Study of Commercialism, Michael Jacobson, described the "numerous nuisance faxes" he had received and complained that they "not only use the recipient's paper, but also prevent faxes from being sent out and prevent legitimate faxes from coming in." (Hearing before Sen. Com. on Commerce, Science, and Transportation, Subcom. on Communications on Sen. Nos. 1462, 1410, and 857, 102d Cong., 1st Sess. at p. 41 (1991).) The director of Computer Professionals for Social Responsibility, Marc Rotenberg, noted that "there is widespread opposition to junk faxes." (Telemarketing/Privacy Issues: Hearing before the House Com. on Energy and Commerce, Subcom. on Telecommunications and Finance, on H.R. Nos. 1304 and 1305, 102d Cong., 1st Sess. at p. 45 (1991).)

A House subcommittee heard from the chair of the Florida Public Service Commission, Thomas Beard, who was also a member of the National Association of Regulatory Utility Commissioners (NARUC), a quasi-governmental, nonprofit organization with members from the governmental agencies of all 50 states who attempt to ensure that telecommunication common carriers establish services and facilities as may be required by public convenience and necessity. Beard stated, "The junk fax advertiser is a nuisance who wants to print [its] ad[] on your paper ... [and] seizes your fax machine so that it is not available for calls you want or need." (Telemarketing/Privacy Issues: Hearing before the House Com. on Energy and Commerce, Subcom. on Telecommunications and Finance, on H.R. Nos. 1304 and 1305, *supra*, at p. 31.) Beard also reported: "[At a meeting] in Washington last year, the NARUC reviewed the situation [concerning fax advertising] and passed a resolution ... urging Congress to enact legislation on the subject. The NARUC said that the legislation should restrict the use of ... facsimile machines for unsolicited advertising and prescribe specific penalties for violations." (*Id.* at p. 31; see *id.* at p. 32 [text of NARUC resolution].)

The legislative counsel for the American Civil Liberties Union, Janlori Goldman, told the House subcommittee, "we ... support the ... limits on fax machines, in terms of sending unsolicited advertising. We think that because of the burden that is placed on the individual who has to pay for the cost of the communication, that that then justifies [a] broader ban [than that placed on telephone solicitations]." (Telemarketing/Privacy Issues: Hearing before the House Com. on Energy and Commerce, Subcom. on Telecommunications and Finance, on H.R. Nos. 1304 and 1305, *supra*, at p. 47.) The subcommittee was well aware that a "festering problem [had] arisen from the so-called 'junk fax.' Junk fax is more than merely irritating. It represents an unfair shifting of the cost of advertising from the advertiser to the unwitting customer.... [U]nsolicited and unwanted faxes can tie up a machine for hours and thwart the receipt of legitimate and important messages." (*Id.* at pp. 3–4.)

Congress recognized that, although considered "[a]n office oddity during the mid-1980s, the facsimile machine has become a primary tool for business to relay instantaneously written communications and transactions." (H.R.Rep. No. 102-317, *supra*, at p. 10.) By 1991, millions of offices in the United States were sending more than 30 billion pages of information via fax each year in an effort to speed communications and cut overnight delivery costs. (*Ibid.*) But "the proliferation of fax machines has been accompanied by

explosive growth in unsolicited facsimile advertising, or 'junk fax.'"
(H.R.Rep. No. 102-317, *supra*, at p. 10.) "Facsimile machines are designed to
accept, process, and print all messages .... The fax advertiser takes advantage
of this basic design by sending advertisements to available fax numbers,
knowing that [they] will be received and printed by the recipient's machine.
This type of telemarketing is problematic for two reasons. First, it shifts some
of the costs of advertising from the sender to the recipient. Second, it
occupies the recipient's facsimile machine so that it is unavailable for
legitimate business messages while processing and printing the junk fax."
(*Ibid.*) "[W]hen a facsimile machine is receiving a fax, it may require several
minutes or more to process and print the advertisement." (*Id.* at p. 25.) "Only
the most sophisticated and expensive facsimile machines can process and
print more than one message at a time." (*Ibid.*)

"When an advertiser sends marketing material to a potential customer
through regular mail, the recipient pays nothing to receive the letter."
(H.R.Rep. No. 102-317, *supra*, at p. 25.) But the recipient of fax advertise-
ments "assumes both the cost associated with the use of the facsimile
machine and the cost of the expensive paper used to print out facsimile
messages." (*Ibid.*) "[T]hese costs are borne by the recipient[s] of the fax
advertisement regardless of their interest in the product or service being
advertised." (*Ibid.*; see also Sen.Rep. No. 102-178, *supra*, at p. 2, reprinted in
1991 U.S. Code Cong. & Admin. News, p. 1969 ["fax messages require the
called party to pay for the paper used"].) It is no wonder that unsolicited fax
advertising is sometimes called "advertising by theft." (See Cal. Sen. Com.
on Business and Professions Analysis of Assem. Bill No. 2944 (2001–2002
Reg. Sess.) Aug. 27, 2002, p. 5.)

As Senator Hollings, the sponsor of the TCPA, noted, "The [Act] also
prohibits unsolicited advertisements sent to fax machines, known as junk fax.
Advertisements today are sent for cruises, home products, investments, and
all kinds of products and services without the consent of the person receiving
them.... These junk fax advertisements can be a severe impediment to
carrying out legitimate business practices and ought to be abolished." (Re-
marks of Sen. Hollings, 137 Cong. Rec. 18123 (1991).) The senator also
stated: "The ... [Act] contains a private right-of-action provision that will
make it easier for consumers to recover damages from receiving these
computerized calls. The provision would allow consumers to bring an action
in State court against any entity that violates the bill. The bill does not,
because of constitutional constraints, dictate to the States which court in each
State shall be the proper venue for such an action, as this is a matter for State
legislators to determine. Nevertheless, it is my hope that States will make it
as easy as possible for consumers to bring such actions, preferably in small
claims court....

"Small claims court or a similar court would allow the consumer to appear before the court without an attorney. The amount of damages in this legislation is set to be fair to both the consumer and the telemarketer. However, it would defeat the purposes of the bill if the attorneys' costs to consumers of bringing an action were greater than the potential damages. I thus expect that the States will act reasonably in permitting their citizens to go to court to enforce this bill." (Remarks of Sen. Hollings, *supra*, 137 Cong. Rec. 30821–30822.)

Congress enacted the TCPA in November 1991. The measure was signed into law on December 20, 1991. Section 227(b) of the Act makes it unlawful "to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." (47 U.S.C. § 227(b)(1)(C).) "Unsolicited advertisement" is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." (*Id.*, § 227(a)(4); see also *id.*, § 227(a)(2) [defining "telephone facsimile machine"].)

### B. *Procedural History*

In two separate superior court cases, *Kaufman v. ACS Systems, Inc.* (Super. Ct. L.A. County, 2000, No. BC222588 (*Kaufman*)) and *Amkraut v. Fax.com, Inc.* (Super. Ct. L.A. County, 2000, No. BC240573 (*Amkraut*)), plaintiffs brought class actions under the TCPA against companies that had faxed unsolicited advertisements to them.

In *Kaufman*, the plaintiffs alleged that defendant ACS Systems, Inc., a software company, had used the telemarketing services of defendant Data-Mart Information Services Corporation to send 13,919 unsolicited faxes to 8,216 recipients in 1998 and 1999. In *Amkraut*, plaintiffs alleged that two telemarketers, defendants Fax.com, Inc., and Cynet, Inc., had sent 728,776 unsolicited fax advertisements to businesses and consumers in Southern California in June 2000. In both cases, defendants asserted that (1) plaintiffs had no private right of action under the TCPA, (2) if such a right existed, it would violate the United States Constitution, and (3) claims under the TCPA cannot be brought as class actions.

In light of the similarities between the *Kaufman* and *Amkraut* cases, they were informally coordinated in the trial court with respect to law and motion matters. Through a combination of demurrers and motions for summary judgment and summary adjudication, the trial court ruled that the TCPA did not violate the Constitution and that claims under the TCPA could be brought as class actions, but that plaintiffs did not have a private right of action in

state court. Judgment was entered in favor of defendants. Plaintiffs filed timely appeals. We ordered the appeals consolidated for purposes of briefing and oral argument.[1]

## II

## DISCUSSION

■ On review of a judgment entered after the sustaining of a demurrer without leave to amend or the granting of motions for summary judgment and summary adjudication, we review the trial court's decision de novo. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 178 179 [70 Cal.Rptr.2d 96].) ■ Independent review is also appropriate in this case because we apply statutory and constitutional provisions to undisputed facts. (See *State Farm Mut. Auto. Ins. Co. v. Department of Motor Vehicles* (1997) 53 Cal.App.4th 1076, 1081 [62 Cal.Rptr.2d 178]; *Rubin v. City of Burbank* (2002) 101 Cal.App.4th 1194, 1199 [124 Cal.Rptr.2d 867].)

With the agreement of the parties, the trial court considered three questions that it found dispositive of the cases. On appeal, we dispose of those questions as follows.

First, do plaintiffs have a private right of action allowing them to file a TCPA action in state court? We answer that question in the affirmative because the TCPA permits the states to prohibit private TCPA actions in their courts, and the California Legislature has not done so.

Second, if a private right of action exists, may plaintiffs prosecute the claim as a class action? The answer is yes, if there is an ascertainable class and a well-defined community of interest among the purported class members.

And, third, does the TCPA violate defendants' First Amendment right to engage in commercial speech? (U.S. Const., 1st Amend.) No. In addition, the TCPA is not void for vagueness under the due process clause. (*Id.*, 5th & 14th Amends.) Nor does it impose excessive damages in violation of the due process clause. (*Ibid.*)

### A. *Private Right of Action*

In determining whether plaintiffs have a private right of action, we examine the language of the TCPA, judicial interpretations of the Act, and the regulation of junk fax under California law.

---

[1] Defendant Cynet, Inc., filed for bankruptcy (*In re Cynet, Inc.* (U.S. Bankr.Ct., S.D.Tex., No. 02-44686-MDL)) and is no longer a party to this appeal.

### 1. *TCPA Claims as Permitted by State Law*

The Act authorizes actions by states: "Whenever the attorney general of a State, or an official or agency designated by a State, has reason to believe that any person has engaged or is engaging in a pattern or practice of telephone calls or other transmissions to residents of that State in violation of this [Act] or the regulations prescribed under this [Act], the State may bring a civil action on behalf of its residents to enjoin such calls, an action to recover for actual monetary loss or receive $500 in damages for each violation, or both such actions." (47 U.S.C. § 227(f)(1).) Federal district courts have exclusive jurisdiction over actions brought by state officials. (*Id.*, § 227(f)(2).) The Federal Communications Commission (FCC) has the right to intervene in the action. (*Id.*, § 227(f)(3).) In addition, the FCC has the power to prosecute civil actions and conduct administrative proceedings under the TCPA, regardless of enforcement by private litigants and state authorities. (See, e.g., *In the Matter of Fax.com, Inc.* (2002) 17 F.C.C.R. 15927 [2002 F.C.C. LEXIS 3853]; *In the Matter of US Notary, Inc.* (2001) 16 F.C.C.R 18398 [2001 F.C.C. LEXIS 5477]; 47 U.S.C. § 227(f)(3), (7).)

■ The TCPA also creates a conditional private right of action, stating: "A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—[¶] (A) an action based on a violation of this [Act] or the regulations [promulgated by the FCC] to enjoin such violation, [¶] (B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or [¶] (C) both such actions." (47 U.S.C. § 227(b)(3)(A)–(C).) The court may impose treble damages for willful or knowing violations. (*Id.*, § 227(b)(3).)

"[T]he legislative history and purpose of the TCPA support the view that Congress intended to confer exclusive jurisdiction on state courts over private rights of action.... Although over forty state legislatures had enacted measures restricting unsolicited telemarketing, these measures had limited effect because states do not have jurisdiction over interstate calls.…" (*Foxhall Realty Law Offices, Inc. v. Telecom. Prem. Serv.* (2d Cir. 1998) 156 F.3d 432, 437, citation omitted.)

"[T]he TCPA is unusual in that it gives state courts exclusive jurisdiction over private rights of action [conferred by federal law] and limits [f]ederal court jurisdiction to civil actions to enforce the TCPA brought by state attorneys general or the Federal Communications Commission.…" (*Schulman v. Chase Manhattan Bank* (2000) 268 A.D.2d 174, 178 [710 N.Y.S.2d 368, 371], citations omitted.) At least six federal circuit courts have

reached " ' "the somewhat unusual conclusion that state courts have exclusive jurisdiction over a [private] cause of action created by" a federal statute[, the TCPA].' " (*Murphey v. Lanier* (9th Cir. 2000) 204 F.3d 911, 915.)

"The clause in [the TCPA] '*if otherwise permitted by the laws or rules of court of a State*' does not condition the substantive right to be free from unsolicited faxes on state approval. Indeed, that substantive right is enforceable by state attorneys general or the Federal Communications Commission irrespective of the availability of a private action in state court. Rather, the clause recognizes that states may refuse to exercise the jurisdiction authorized by the [TCPA]. Thus, a state could decide to prevent its courts from hearing private actions to enforce the TCPA's substantive rights....

"[I]t is readily apparent from the congressional findings contained in the TCPA itself that Congress considered the effect that a newly created private right of action would have on judicial administration. Specifically finding that 18 million telemarketing calls are made daily ..., Congress understandably avoided opening federal courts to the millions of potential private TCPA claims by authorizing private actions only in state courts, presumably in the small claims courts. Similarly concerned over the potential impact of private actions on the administration of state courts, Congress included a provision to allow the states to prohibit private TCPA actions in their courts. We have no doubt that Congress has a legitimate interest in not overburdening state and federal courts. Nor can it be doubted that Congress has a legitimate interest in respecting the states' judgments about when their courts are overburdened. With those interests in mind and recognizing that other enforcement mechanisms are available in the TCPA[, namely, enforcement by the FCC or state attorneys general], ... Congress acted rationally in ... allowing states to close [their courts] to the millions of private actions that could be filed if only a small portion of each year's 6.57 billion telemarketing transmissions were illegal under the TCPA. [¶]...[¶]

"... Apparently recognizing that the exclusivity of state court jurisdiction could create a problem ..., Congress avoided any constitutional issue by refusing to coerce states to hear private TCPA actions, providing instead that a person or entity may, '*if otherwise permitted by the laws or rules of court of a State*,' bring a TCPA action in an appropriate court of that state.... States thus retain the ultimate decision of whether private TCPA actions will be cognizable in their courts." (*Intern. Science & Tech. Institute v. Inacom Comm.* (4th Cir. 1997) 106 F.3d 1146, 1156–1158, italics added.) "[S]tates have been given, *subject to their consent*, exclusive subject matter jurisdiction over private actions authorized by the Telephone Consumer Protection Act of 1991 ...." (*Id.* at p. 1150, italics added; accord, *Foxhall Realty Law Offices, Inc. v. Telecom. Prem. Serv., supra*, 156 F.3d at pp. 435–438; *Murphey v. Lanier, supra*, 204 F.3d at pp. 913–915.)

"Although actual monetary losses from telemarketing abuses are likely to be minimal, this private enforcement provision puts teeth into the statute by providing for statutory damages and by allowing consumers to bring actions on their own. Consumers who are harassed by telemarketing abuses can seek damages themselves, rather than waiting for federal or state agencies to prosecute violations. Although ... the statute does authorize states to bring actions on their citizens' behalf, the sheer number of calls made each day—more than 18,000,000—would make it impossible for government entities alone to completely or effectively supervise this activity." (*Erienet, Inc. v. Velocity Net, Inc.* (3d Cir. 1998) 156 F.3d 513, 515.)

### 2. State Permission

In deciding whether a state permits private suits under the TCPA, all but one state court have held that a state's permission does not require any affirmative conduct on the part of the state legislature, nor the enactment of court rules. ■ Put another way, a person may file a TCPA action in state court as long as the state has not prohibited it.

In one of the early cases to address the issue of state permission, the Appellate Division of the New York Supreme Court stated: "In the absence of a State statute declining to exercise the jurisdiction authorized by the [TCPA], a State court has jurisdiction over TCPA claims .... New York has not refused to exercise such jurisdiction, and thus [the lower court] should not have dismissed the claim." (*Kaplan v. Democrat and Chronicle* (1999) 266 A.D.2d 848, 848 [698 N.Y.S.2d 799, 800]; accord, *Schulman v. Chase Manhattan Bank, supra,* 268 A.D.2d at p. 179 [710 N.Y.S.2d at p. 372].)

The Missouri Supreme Court concluded that "the TCPA does not condition the right to bring a private cause of action ... on a state's adoption of specific legislation permitting such suits. Suit may be brought unless a state does not otherwise permit such a suit. Missouri law does not prohibit the filing of an action under the TCPA." (*Reynolds v. Diamond Foods & Poultry, Inc.* (Mo. 2002) 79 S.W.3d 907, 910.)

The Georgia Court of Appeals reached the same conclusion, stating: "[W]e will not construe the TCPA in a manner which leaves Georgia citizens without a remedy. We ... construe the TCPA as creating a private right of action and conferring jurisdiction upon state courts. [¶] The trial court correctly determined that Georgia law does not expressly prohibit private TCPA actions for the transmission of unsolicited facsimile advertisements." (*Hooters of Augusta, Inc. v. Nicholson* (2000) 245 Ga.App. 363, 365 [537 S.E.2d 468, 470–471], fn. omitted.) The courts of New Jersey and Pennsylvania are in agreement. (See *Zelma v. Market U.S.A.* (2001)

343 N.J.Super. 356, 362–367 [778 A.2d 591, 595–598]; *Aronson v. Fax.com Inc.* (2001) 51 Pa.D. & C.4th 421, 428–436 [2001 Pa.D.&C. LEXIS 45, pp.**9–**22].)

The lone departure from this line of state cases is a decision by the Texas Court of Appeals. That court concluded, in cursory analysis, that "Congress intended the states to pass legislation or promulgate court rules consenting to state court actions based on the TCPA, before such suits under the TCPA may be brought in state courts." (*Autoflex Leasing v. Mfrs. Auto Leasing* (Tex.Ct.App. 2000) 16 S.W.3d 815, 817 (*Autoflex*).) In other words, a state must affirmatively approve—by act of the legislature or adoption of court rules—the filing of private TCPA actions in state court.

As one commentator has noted, the court in *Autoflex, supra,* 16 S.W.3d 815, "cited several of the federal court TCPA decisions in error and held in a short and poorly reasoned opinion that 'Congress intended the states to pass legislation or promulgate court rules consenting to state court actions based on the TCPA ....' [¶] In addition to being specifically rejected by these courts, no appellate federal court has ever supported the [affirmative approval] argument." (Biggerstaff, *State Court and the Telephone Consumer Protections Act of 1991: Must States Opt-In? Can States Opt-Out?* (2001) 33 Conn. L.Rev. 407, 415.)

### 3. *Regulation of Junk Fax by California*

California appellate courts have not decided whether a private right of action exists under the TCPA. To answer that question, we consider the state's legislative attempts to curb unsolicited fax advertisements.

In September 1989, the California Legislature passed a junk fax bill (Sen. Bill No. 487 (1989–1990 Reg. Sess.)), but the Governor vetoed the measure (Sen. Bill No. 487, vetoed by Governor, Sept. 24, 1989, 1 Sen. Final Hist. (1989–1990 Reg. Sess.) p. 364)). Instead, the Governor signed a bill that required the California Public Utilities Commission (PUC) to study the issue and prepare a report documenting any evidence that unsolicited fax advertisements were a problem. (Sen. Bill No. 993 (1989–1990 Reg. Sess.) § 1; Stats. 1989, ch. 345, p. 1460; Governor's veto message to Sen. on Sen. Bill No. 487 (Sept. 24, 1989) 3 Sen. J. (1989–1990 Reg. Sess.) p. 4145.)

In its December 31, 1990 report, the PUC stated: "[I]t appears that unsolicited telefacsimile telecommunications are not currently a significant problem in California. However, California fax owners do not like unsolicited faxes, almost irrespective of their source, and believe that the problem will get worse in the next few years. The current cost of 'junk fax' [incurred by fax machine] users [in California] is estimated to be over $17 million a year.

There is strong support for a variety of possible legislative actions to limit unsolicited faxes." (Cal. P.U.C., Rep. to the Legis., Unsolicited Telefacsimile Marketing Communications Per SB 993 (1990) p. 1.)

In conjunction with the PUC report, a random survey was conducted of 1,605 respondents, consisting of 1,298 businesses, 207 government employees, and 100 individuals who worked out of their homes. (Cal. P.U.C., Rep. to the Legis., Unsolicited Telefacsimile Marketing Communications Per SB 993, *supra*, appen. p. 1.) The survey indicated that fax machine users attributed several problems to junk fax, including wasted time, wasted paper, costs, tying up the fax machine, and interference with operations. (*Id.* at p. 3.) Eighty-two percent of the businesses, 84 percent of the government offices, and 78 percent of the home fax users favored some form of legislation restricting unsolicited faxes. (*Id.* at p. 7.)

In 1992, the California Legislature passed a bill that prohibited the sending of unsolicited fax advertisements unless the faxed document contained a toll-free telephone number and an address that the recipient could use to stop further advertisements (Assem. Bill No. 2438 (1991–1992 Reg. Sess.) § 1). The bill added section 17538.4 to the Business and Professions Code. A violation of the statute constituted an infraction authorizing a $500 fine per transmission. The new statute provided:

"(a) No person or entity conducting business in this state shall fax or cause to be faxed documents consisting of unsolicited advertising material for the lease, sale, rental, gift offer, or other disposition of any realty, goods, services, or extension of credit unless that person or entity establishes a toll-free telephone number which a recipient of the unsolicited faxed documents may call to notify the sender not to fax the recipient any further unsolicited documents.

"(b) All unsolicited faxed documents subject to this section shall include a statement, in at least 9-point type, informing the recipient of the toll-free telephone number the recipient may call, and an address the recipient may write to, notifying the sender not to fax the recipient any further unsolicited documents to the fax number, or numbers, specified by the recipient.

"(c) Upon notification by a recipient of his or her request not to receive any further unsolicited faxed documents, no person or entity conducting business in this state shall fax or cause to be faxed any unsolicited documents to that recipient.

"(d) Any violation of subdivision (c) is an infraction punishable by a fine of five hundred dollars ($500) for each and every transmission...." (Stats.

1992, ch. 564, § 1, pp. 2082–2083; all further citations to section 17538.4 are to the Business and Professions Code.)

The enrolled bill report for section 17538.4 indicated that "by virtue of [the statute's] placement in Business and Professions Code §§ 17500 et seq. (relating to false and misleading advertising), violations would be subject to civil penalties of up to $2,500 per violation, injunctive relief and restitution to the injured party. (Such actions are brought by the Attorney General and local prosecutors.)" (Cal. Dept. of Consumer Affairs, Enrolled Bill Rep. on Assem. Bill No. 2438 (1991–1992 Reg. Sess.) Aug. 14, 1992, p. 1 (Enrolled Bill Report).)[2]

After noting that Congress had enacted the TCPA, the Enrolled Bill Report stated: "On December 20, 1991, the President signed PL 102-243, which (among other things) prohibits unsolicited fax advertisements. 'Unsolicited' is defined in the federal law as 'without the recipient's prior express invitation or permission.' The precise meaning of 'express invitation or permission' will have to be addressed in the implementing regulations which will be adopted by the [FCC].... [¶] ... [¶] ... This process could take a couple of years.... [O]nce the FCC's regulations are in place the federal law and regulations will supersede AB 2438 since they will be more protective. But until that time, AB 2438 would give California fax machine owners more protection than they currently have against unsolicited fax ads." (Enrolled Bill Rep., *supra*, at p. 2, underscoring in original.)

Under the heading "Fiscal Impact," the Enrolled Bill Report read: "None to the department. [The bill] [c]reates a crime punishable by an infraction. By virtue of its proposed location in the Business and Professions Code, repeated and willful violations would be subject to the penalties for false and misleading advertising: civil penalties of up to $2,500 per violation (redirected in whole or in part to the county or state, depending on who enforces it), injunctive relief, restitution and a misdemeanor penalty. These provisions are enforced locally and by the Attorney General." (Enrolled Bill Rep., *supra*, at p. 2.)

Under "Argument," the Enrolled Bill Report explained: "The author's office is aware of the federal legislation but is concerned that it may not entirely prohibit unsolicited fax transmissions (because the FCC will be

---

[2] We may rely on an enrolled bill report in interpreting a statute. (See, e.g., *Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1041–1042 [130 Cal.Rptr.2d 672, 63 P.3d 228]; *Konig v. Fair Employment & Housing Com.* (2002) 28 Cal.4th 743, 749–751, 757 [123 Cal.Rptr.2d 1, 50 P.3d 718]; *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 429, 431–432 [101 Cal.Rptr.2d 200, 11 P.3d 956].)

adopting regulations to further define the terms in the federal law) and because of the time delay in the effective date due to the need to adopt implementing regulations.

"... We view unsolicited faxed ads as an invasion of privacy. and an infringement on personal property. We know of no other advertising situation where the recipient is forced to bear a portion of the advertiser's costs." (Enrolled Bill Rep., *supra*, at p. 3, underscoring in original.)

In 1998, the Legislature amended section 17538.4 to include restrictions on unsolicited advertising through "electronic mail" (e-mail). The amended statute prohibited e-mail solicitations unless the sender established a toll-free telephone number or return e-mail address that the recipient could use to notify the sender not to e-mail any further solicitations. (See Stats. 1998, ch. 865, § 1; 5 West's Ann. Cal. Bus. & Prof. Code (2003 supp.) § 17538.4, pp. 101–102.)

During the 2001–2002 legislative session, the Legislature took another look at section 17538.4. This time, the Legislature decided to repeal the restrictions on unsolicited fax advertisements. Assembly Bill No. 2944 was introduced for that purpose. (See Assem. Bill No. 2944 (2001–2002 Reg. Sess.) § 1; Stats. 2002, ch. 700, § 1; Historical and Statutory Notes, 5 West's Ann. Cal. Bus. & Prof. Code (2003 supp.) § 17538.4, pp. 101–103.)

The legislative analysis of Assembly Bill No. 2944, as reported by the Senate Committee on Business and Professions, was as follows:

**"State Law—Business and Professions Code Section 17538.4.** In 1992, the Legislature passed and the Governor signed AB 2438, [the bill that restricted unsolicited fax advertisements]. Section 17538.4 prohibits unsolicited faxes unless the sender meets certain requirements, such as providing an 800 number so that the recipient can call to have his/her name removed.

"The Author [of the current bill] argues that [the 1992 legislation] was established for the purpose of protecting Californians during the estimated two-year interim between the passage of the federal ban and the time when the [FCC's] regulations implementing the federal ban would become effective. Evidence to support the Author's view can be found in letters from the Department of Consumer Affairs (DCA) .... For example, in DCA's enrolled bill report ..., they note that the federal law (which would prohibit unsolicited faxes altogether) goes into effect on December 20, 1992 (but the prohibition will have no effect until the implementing regulations are in place), which could take a couple of years. The enrolled bill report also states that assuming that any definitions the FCC adopts do not undermine the prohibition, once

the FCC's regulations are in place the federal law and regulations will supersede [section 17538.4] since they will be more protective. But until that time, [section 17538.4] would give California fax machine owners more protection than they currently have against unsolicited faxes.

"**Federal Law—The TCPA.** On December 20, 1991, the U.S. Congress enacted the TCPA. The TCPA mandated that the FCC implement regulations to protect the privacy rights of citizens by restricting the use of the telephone network for unsolicited advertising. On September 17, 1992, the FCC adopted a Report and Order which established rules governing unwanted telephone solicitations and regulated the use of automatic telephone dialing systems, prerecorded or artificial voice messages, and telephone facsimile machines. Among other things, these restrictions prohibit the transmission of unsolicited advertisements by telephone facsimile machines.

"The TCPA provides consumers with several options to enforce limitations against unsolicited telemarketing contacts. Absent state law to the contrary, the TCPA permits consumers to file suit in state court if an entity violates the TCPA prohibitions on the use of facsimile machines .... Consumers may also bring their complaints regarding TCPA violations to the attention of the state attorney general or an official designated by the state. This state entity may bring a civil action on behalf of its residents to enjoin a person or entity engaged in a pattern of telephone calls or other transmissions in violation of the TCPA. Additionally, a consumer may request that the FCC take enforcement actions regarding violations of [the] TCPA and the regulations adopted to enforce it." (Sen. Com. on Business and Professions, Analysis of Assem. Bill No. 2944 (2001–2002 Reg. Sess.), *supra*, pp. 2–3, boldface added.)

The Legislature passed Assembly Bill No. 2944 in August 2002, and the Governor approved it on September 19, 2002. Under the bill, section 17538.4's restrictions on unsolicited fax advertisements were repealed effective January 1, 2003. (See Historical and Statutory Notes, 5 West's Ann. Cal. Bus. & Prof. Code (2003 supp.) § 17538.4, pp. 101–103; Cal. Const., art. IV, § 8, subd. (c).) Meanwhile, on September 17, 1992, the FCC adopted regulations implementing the TCPA. (See *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Rep. and Order (adopted Sept. 17, 1992; released Oct. 16, 1992) 7 F.C.C.R. 8752, appen. B [1992 F.C.C. LEXIS 7019, pp.**87–**95], codified at 47 C.F.R. § 64.1200 (2003).)

### 4. *Interplay Between State and Federal Law*

In 1992, the California Legislature enacted section 17538.4 as a stopgap measure to protect California residents from unsolicited fax advertisements

until the FCC adopted regulations implementing the TCPA. The Legislature intended that "once the FCC's regulations are in place the federal law and regulations will supersede [section 17538.4] since they will be more protective." (Enrolled Bill Rep., *supra*, at p. 2.) The Legislature reiterated that intent when it repealed the fax restrictions in 2002. (See Sen. Com. on Business and Professions, Analysis of Assem. Bill No. 2944, *supra*, at p. 3.)

The legislative history shows that section 17538.4 was never intended to prohibit a TCPA action in California courts. Rather, section 17538.4 was meant to provide California residents with some degree of protection until the FCC's regulations took effect. The FCC adopted regulations on September 17, 1992, which it released on October 16, 1992. Defendants' alleged unlawful conduct occurred in 1998, 1999, and 2000, long after the regulations were promulgated.

Defendants offer a different, but incorrect, reading of the legislative history of section 17538.4. They assert that the statute was intended to displace the TCPA—that California did not consent to private TCPA actions in state court. Defendants emphasize that, in 1998, when the Legislature amended section 17538.4 to prohibit unsolicited email advertisements, the fax provisions were left intact notwithstanding that the FCC had adopted regulations in 1992. This, defendants argue, means that the fax restrictions were not a short-term measure but were intended to last several years. But defendants read too much into the 1998 amendments. The unmistakable purpose of section 17538.4 was to provide *temporary* relief for unsolicited fax advertisements, as made clear in the legislative history materials accompanying the statute's passage in 1992 and repeal in 2002. The 1998 amendments do not prove otherwise. "[W]e take cognizance of subsequent declarations of legislative intent if the declaration is consistent with the original intent." (*In re Michael D.* (2002) 100 Cal.App.4th 115, 123 [121 Cal.Rptr.2d 909].)

In the same vein, we reject defendants' argument that compliance with section 17538.4 precludes liability for violations of the TCPA. We acknowledge that "[i]f the [state] Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 182 [83 Cal.Rptr.2d 548, 973 P.2d 527]; accord, *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 827–830 [135 Cal.Rptr.2d 1, 69 P.3d 927].) But, once again, section 17538.4's legislative history is defendants' undoing.

By enacting section 17538.4, the Legislature intended to provide a remedy that would eventually give way to the TCPA—a "more protective" statute.

(See Enrolled Bill Rep., *supra*, at p. 2.) The Legislature has therefore considered certain conduct—the sending of unsolicited fax advertisements—and concluded that an action should lie, namely, an action under the TCPA in state court.

Thus, assuming for the sake of discussion that defendants have always complied with section 17538.4, they are not thereby rendered immune under the TCPA. In *Hooters of Augusta, Inc. v. Nicholson, supra*, 245 Ga.App. at pages 365–366 [537 S.E.2d at page 471], *Texas v. American Blastfax, Inc.* (W.D.Tex. 2000) 121 F.Supp.2d 1085 at page 1089, and *Van Bergen v. State of Minn.* (8th Cir. 1995) 59 F.3d 1541 at page 1548, the courts held that the defendants had to comply with the TCPA regardless of the applicability of state statutes governing unsolicited fax advertisements.

As stated in *Texas v. American Blastfax, Inc., supra*, 121 F.Supp.2d at page 1089: "Simply because a party complies with one law does not preclude it from violating another." Further, as one court has noted, the case law interpreting the TCPA "does not stand for the proposition that a state statute can give permission to violate a federal statute." (*Minn. v. Sunbelt Communs. & Mktg.* (U.S.Dist.Ct., D.Minn., Sept. 30, 2002, Civ. No. 02-CV-770 (JEL/JGL) 2002 U.S.Dist. LEXIS 18990, p.\*23). The FCC agrees: "[T]he applicability of state law is not relevant to questions of compliance with federal law here. Regardless of what state law does or does not require, [the fax advertiser] had an independent obligation to comply with the TCPA and the Commission's associated rules." (*In the Matter of US Notary, Inc., supra*, 16 F.C.C.R. at p. 18402 [2001 F.C.C. LEXIS 5477 at p.\*\*14].) And "[t]he FCC is due substantial deference in its implementation of the ... Act, and 'even greater deference' when interpreting its own rules and regulations." (*Global NAPs, Inc. v. F.C.C.* (D.C. Cir. 2001) 345 U.S. App. D.C. 390 [247 F.3d 252, 257–258].)

For their part, plaintiffs contend that compliance with section 17538.4 does not affect defendants' liability under the TCPA because, among other reasons, the TCPA preempts section 17538.4. We do not reach that question given our conclusion that the California Legislature has not prohibited private TCPA actions in state court, and the TCPA permits the states to make that choice.

## B. *Constitutional Challenges*

Defendants contend that the TCPA is unconstitutional because it violates the First Amendment (U.S. Const., 1st Amend.), the vagueness doctrine under the due process clause (U.S. Const., 5th & 14th Amends.), and the limitation on excessive damages under the due process clause (U.S. Const., 5th & 14th Amends.).

1. *First Amendment*

"For over 25 years, the [United States Supreme] Court has recognized that commercial speech ... fall[s] [within] the purview of the First Amendment.... [T]he Court has afforded commercial speech a measure of First Amendment protection ' "commensurate" ' with its position in relation to other constitutionally guaranteed expression." (*Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 553 [150 L.Ed.2d 532, 121 S.Ct. 2404].) The high court has "recogni[zed] [a] 'distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech', ...." (*Id.* at p. 554.) "[T]he Constitution 'accords less protection to commercial speech than to other constitutionally safeguarded forms of expression.' " (*Posadas de Puerto Rico Assoc. v. Tourism Co.* (1986) 478 U.S. 328, 349 [92 L.Ed.2d 266, 106 S.Ct. 2968].)

" '[T]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it.' ... This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." (*Edenfield v. Fane* (1993) 507 U.S. 761, 770–771 [123 L.Ed.2d 543, 113 S.Ct. 1792], citations omitted; accord, *Greater New Orleans Broadcasting Assn., Inc. v. United States* (1999) 527 U.S. 173, 188 [144 L.Ed.2d 161, 119 S.Ct. 1923].)

"In reviewing the constitutionality of a statute, 'courts must accord substantial deference to the predictive judgments of Congress.' ... Our sole obligation is 'to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence.' ... This principle has special significance in cases, like this one, involving congressional judgments concerning regulatory schemes of inherent complexity and assessments about the likely interaction of industries undergoing rapid economic and technological change.... Though different in degree, the deference to Congress is ... akin to deference owed to administrative agencies because of their expertise.... This is not the sum of the matter, however. We owe Congress' findings an additional measure of deference out of respect for its authority to exercise the legislative power. Even in the realm of First Amendment questions where Congress must base its conclusions upon substantial evidence, deference must be accorded to its findings as to the harm to be avoided and to the remedial measures adopted for that end, lest we infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy." (*Turner Broadcasting System, Inc. v. FCC* (1997) 520 U.S. 180, 195–196 [137 L.Ed.2d 369, 117 S.Ct. 1174], citations omitted.)

" 'It is a matter of public interest that [economic] decisions, in the aggregate, be intelligent and well-informed. To this end, the free flow of commercial information is indispensable.' ... Indeed, ... a 'particular consumer's interest in the free flow of commercial information ... may be as keen, if not keener by far, than his interest in the day's most urgent political debate.' ... 'The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish. Some of the ideas and information are vital, some of slight worth. But the general rule is that the speaker and the audience, not the government, assess the value of the information presented. Thus, even a communication that does no more than propose a commercial transaction is entitled to the coverage of the First Amendment.' ...

"Although commercial speech is protected by the First Amendment, not all regulation of such speech is unconstitutional.... In *Central Hudson* [*Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557 [65 L.Ed.2d 341, 100 S.Ct. 2343] (*Central Hudson*)], [the United States Supreme Court] articulated a test for determining whether a particular commercial speech regulation is constitutionally permissible. Under that test we ask as a threshold matter whether the commercial speech concerns unlawful activity or is misleading. If so, then the speech is not protected by the First Amendment. If the speech concerns lawful activity and is not misleading, however, we next ask 'whether the asserted governmental interest is substantial.' ... If it is, then we 'determine whether the regulation directly [and materially] advances the governmental interest asserted,' and, finally, 'whether it is not more extensive than is necessary to serve that interest.' ... Each of these latter three inquiries must be answered in the affirmative for the regulation to be found constitutional." (*Thompson v. Western States Medical Center* (2002) 535 U.S. 357, 366–367 [152 L.Ed.2d 563, 122 S.Ct. 1497], citations omitted; see *Edenfield v. Fane, supra*, 507 U.S. at p. 767.) "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort." (*Thompson v. Western States Medical Center, supra*, 535 U.S. at p. 373.)

In the present case, the speech at issue does not involve unlawful activity, nor is it misleading. We therefore apply the remaining prongs of the *Central Hudson* test. In that regard, we note that the parties, too, rely on *Central Hudson* in addressing whether the TCPA violates the First Amendment. (Cf. *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939 [119 Cal.Rptr.2d 296, 45 P.3d 243] [defining "commercial" speech], cert. granted Jan. 10, 2003, 537 U.S. 1099

[123 S.Ct. 817, 154 L.Ed.2d 767], cert. dism. as improvidently granted (2003) 539 U.S. 461 [156 L.Ed.2d 580, 123 S.Ct. 2554].)[3]

### a. *Substantial Governmental Interest*

The government has "the obligation to demonstrate that it is regulating speech in order to address what is in fact a serious problem...." (*Edenfield v. Fane, supra,* 507 U.S. at p. 776.) " 'Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.' ... Even under the First Amendment's somewhat more forgiving standards for restrictions on commercial speech, a State may not curb protected expression without advancing a substantial governmental interest." (*Id.* at p. 777, citation omitted.) The government may justify *restrictions* on commercial speech through anecdotes, history, consensus, and "simple common sense." (*Florida Bar v. Went For It, Inc.* (1995) 515 U.S. 618, 628 [132 L.Ed.2d 541, 115 S.Ct. 2371] (*Florida Bar*).) Empirical data is not necessary. (See *id.* at pp. 628–629; *Misouri ex rel. Nixon v. American Blast Fax, Inc.* (8th Cir. 2003) 323 F.3d 649, 654.) ▮ In contrast, a *total ban on truthful, nonmisleading* commercial speech about a lawful product or service requires something more than anecdotes and common sense. (See *Va. Pharmacy Bd. v. Va. Consumer Council* (1976) 425 U.S. 748, 771–773 & fn. 24 [48 L.Ed.2d 346, 96 S.Ct. 1817]; *44 Liquormart, Inc. v. Rhode Island* (1996) 517 U.S. 484, 501–508 [134 L.Ed.2d 711, 116 S.Ct. 1495] (*Liquormart*) (lead opn. of Stevens, J.); *id.* at pp. 529–532 (conc. opn. of O'Connor, J.).)

In resolving defendants' First Amendment claim, it is necessary at the outset to examine the way in which the TCPA restricts the use of unsolicited fax advertisements. On September 17, 1992, the FCC adopted regulations implementing the TCPA. The regulations state in part, "No person may [¶] ... [¶] ... [u]se a *telephone facsimile machine,* computer, or other device to send an *unsolicited advertisement* to a telephone facsimile machine." (*In the Matter of Rules and Regulations Implementing the Telephone Consumer*

---

[3] Plaintiffs contend we need not reach the First Amendment issue because the sending of junk fax constitutes a trespass to chattels and is not protected speech. For that proposition they rely on cases involving unsolicited electronic mail (email), commonly known as "spam." (See, e.g., *CompuServe, Inc. v. Cyber Promotions, Inc.* (S.D. Ohio 1997) 962 F.Supp. 1015; *America Online, Inc. v. IMS* (E.D.Va. 1998) 24 F.Supp.2d 548.) In *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342 [1 Cal.Rptr.3d 3, 71 P.3d 296] the California Supreme Court recently held that the sending of unsolicited email does not give rise to a cause of action for trespass to chattels. We therefore address defendants' First Amendment argument.

*Protection Act of 1991, supra,* 7 F.C.C.R. 8752, appen. B [1992 F.C.C. LEXIS 7019, at pp.\*\*88–\*\*89], codified at 47 C.F.R. § 64.1200(a)(3) (2003), italics added.)

The regulations define "telephone facsimile machine" as "equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." (*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, supra,* 7 F.C.C.R. 8752, appen. B [1992 F.C.C. LEXIS 7019, at p.\*\*92], codified at 47 C.F.R. § 64.1200(f)(2) (2003).) "Unsolicited advertisement" means "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." (*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, supra,* 7 F.C.C.R. 8752, appen. B [1992 F.C.C. LEXIS 7019, at pp.\*\*93–\*\*94], codified at 47 C.F.R. § 64.1200(f)(5) (2003).)

In a report accompanying the FCC's regulations, the Commission distinguished between the potential liability of "fax broadcasters"—entities or persons whose facilities are used to send a fax—and the potential liability of the advertiser—the author or originator of the fax. The FCC explained: "Parties commenting on the facsimile requirements for senders of facsimile messages urge the Commission to clarify that carriers who simply provide transmission facilities that are used to transmit others' unsolicited facsimile advertisements may not be held liable for any violations of [the regulations]. We concur with these comment[s]. In the absence of 'a high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions,' common carriers will not be held liable for the transmission of a prohibited facsimile message." (*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, supra,* 7 F.C.C.R. at pp. 8779–8780 [1992 F.C.C. LEXIS 7019, at pp.\*\*69–\*\*70], fn. omitted.)

The FCC report also stated: "In banning telephone facsimile advertisements, the TCPA leaves the Commission without discretion to create exemptions from or limit the effects of the prohibition … ; thus, such transmissions are banned in our rules as they are in the TCPA.… We note, however, that facsimile transmission from persons or entities who have an *established business relationship* with the recipient can be deemed to be invited or permitted by the recipient." (*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, supra,* 7 F.C.C.R. at p. 8779, fn. 87 [1992 F.C.C. LEXIS 7019, at p.\*\*70, fn. 87],

citations omitted, italics added; see *id.* at p. 8771 [1992 F.C.C. LEXIS 7019, at pp.**47–**48].)

The term "established business relationship" means "a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party." (47 C.F.R. § 64.1200(f)(4) (2003).)

In 1995, the FCC again addressed the liability of fax broadcasters, stating: "Some petitioners request clarification of whether responsibility for compliance with the ban on unsolicited facsimile advertising ... lies with the entity or entities on whose behalf such messages are sent or with service providers ('fax broadcasters'). Generally these [commentators] are fax broadcasters who disseminate facsimile messages for their clients. They favor excluding any fax broadcaster, whether or not a common carrier, from responsibility for compliance with the rules, and assigning ultimate responsibility to the author or originator of the facsimile message. The [commentators] contend that the [original regulations] indicate[] only that 'carriers' would not be held liable, and did not indicate whether service providers who are not carriers would also be exempt from such requirements.

"We clarify that the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements, and that fax broadcasters are not liable for compliance with this rule. This interpretation is consistent with the TCPA's legislative history, and with our finding in the Report and Order that carriers will not be held liable for the transmission of a prohibited message." (*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Mem. Opn. and Order (adopted July 26, 1995; released Aug. 7, 1995) 10 F.C.C.R. 12391, 12407–12408 [1995 F.C.C. LEXIS 5179, pp.**38–**39], fns. omitted, reconsideration granted on another point in *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of* 1991, Order on Further Reconsideration (adopted April 3, 1997, released April 10, 1997) 12 F.C.C.R. 4609.)

More recently, the FCC issued a "Notice of Apparent Liability for Forfeiture" to a fax broadcaster, indicating that broadcasters may be held liable under the TCPA, depending on the circumstances. The FCC notice stated in part: " '[A]lthough entities that merely transmit facsimile messages on behalf of others are not liable for compliance with the prohibition on faxing

unsolicited advertisements, the exemption from liability does not exist when a fax transmitter has ' "a high degree of involvement or actual notice of an illegal use and [has] fail[ed] to take steps to prevent such transmissions.' " Accordingly, fax transmitters do not enjoy an absolute exemption from liability under the TCPA and the Commission's Rules.' [¶] ...

"The record here clearly establishes that [the broadcaster] uses its own extensive distribution list of telephone facsimile numbers to send its clients' advertisements, and that it knowingly sends advertisements to such numbers without regard to whether the facsimile machine owner or responsible party either granted permission to send the advertisement or had an established business relationship with the advertiser or [the broadcaster]. In addition, [the broadcaster] apparently reviews the text of its clients' advertisements, not only to assist with graphic design, but also to assess content. Such conduct is clear evidence of [the broadcaster's] high degree of involvement in the unlawful activity." (*In the Matter of Fax.com, Inc.*, *supra*, 17 F.C.C.R. at pp. 15929–15936 [2002 F.C.C. LEXIS 3853, at pp.**4–**23] fns. omitted.)

■ Thus, the "TCPA does not act as a total ban on fax advertising." (*Missouri ex rel. Nixon v. American Blast Fax, Inc.*, *supra*, 323 F.3d at p. 659.) A fax broadcaster may send advertisements to those with whom it or the advertiser has an established business relationship. Fax broadcasters and advertisers may also obtain consent for their faxes through mailings, telephone calls made in accordance with telemarketing regulations, and interaction with customers at their places of business. (*Ibid.*; *Van Bergen v. State of Minn.*, *supra*, 59 F.3d at p. 1556; *Moser v. F.C.C.* (9th Cir. 1995) 46 F.3d 970, 975; 47 U.S.C. § 227; 47 C.F.R. § 64.1200 (2003); 15 U.S.C. §§ 6101–6108; 16 C.F.R. §§ 310.1–310.9 (2003).) "Advertisers remain free to publicize their products through any legal means; they simply cannot do so through an *unsolicited* fax." (*Missouri ex rel. Nixon v. American Blast Fax, Inc.*, *supra*, 323 F.3d at p. 659, italics added.) In short, defendants are incorrect in asserting that the TCPA constitutes a total or blanket ban on fax advertisements.

■ We conclude, after examining the restrictions imposed by the TCPA and the evidence supporting the Act's passage, that the government has a substantial interest in regulating unsolicited fax advertisements. We need not repeat here the TCPA's legislative history, which contains substantial evidence of the serious problems caused by junk fax. Suffice it to say that a "festering problem [had] arisen from the so-called 'junk fax.' Junk fax ... represents an unfair shifting of the cost of advertising from the advertiser to the unwitting customer.. ... [and] [u]nsolicited ... faxes can tie up a machine for hours and thwart the receipt of legitimate and important messages."

(Telemarketing/Privacy Issues: House Com. on Energy and Commerce, Subcom. on Telecommunications and Finance, Hearing on H.R. Nos. 1304 and 1305, *supra*, pp. 3–4.)

In 1991, at the time of the TCPA's passage, approximately half of the states were considering legislation to restrict unsolicited fax advertisements. That fact alone indicates the existence of a serious problem. In California, for example, unsolicited fax advertisements were costing recipients over $17 million per year. But regulation at the state level was not enough. "Congress recognized that state regulation of telemarketing activity was ineffective because it could be avoided by interstate operations. Federal legislation was necessary in order to prevent telemarketers from evading state restrictions." (*Murphey v. Lanier*, *supra*, 204 F.3d at p. 915; accord, *Intern. Science & Tech. Institute v. Inacom Comm.*, *supra*, 106 F.3d at p. 1150.)

Defendants counter that even if a substantial governmental interest existed when the TCPA was enacted, sweeping changes in fax technology have subsequently reduced the cost of receiving an unsolicited advertisement. Today, numerous fax machines are on the market that print a fax for less than 2 cents a page. Some newer models also come with several features that benefit the fax recipient—"toner saver," auto-redial, fax-number blocking, volume control, and fax-to-electronic mail capabilities. Many fax machines now have dual access memory, which stores a document so that it can be sent after an incoming or outgoing fax is processed. And, over the years, the price of a fax machine has steadily dropped.

This is all well and good. But defendants' description of today's state-of-the- art fax machines says nothing about the number or percentage of fax owners who have them. Defendants have made no showing as to the usage or market share of high-end fax machines. Quite the opposite, the record contains a declaration from an entrepreneur who has used the same fax machine for the last 10 years and pays around 15 cents per page for unsolicited advertisements. And fax advertisements sent to the latest generation of fax machines, like those sent in 1991, still impose costs on the recipient for printing and business disruptions.

Although a fax machine manufactured in 2002 may have more features than a 1991 model, the United States Court of Appeals for the Ninth Circuit has stated that "[t]he possibility of future technological advances allowing simultaneous transmission and eliminating the need for paper does not alter [the] conclusion [that unsolicited fax advertisements shift significant advertising costs to consumers]. We look at the problem as it existed when Congress enacted the statute, rather than speculate upon what solutions may turn up in the future." (*Destination Ventures, Ltd. v. F.C.C.* (9th Cir. 1995) 46 F.3d 54, 57; cf. *United States v. Playboy Entertainment Group, Inc.* (2000) 529 U.S.

803, 813–814 [146 L.Ed.2d 865, 120 S.Ct. 1878] [future availability of Internet-screening software mentioned by court in striking down overbroad restriction on noncommercial speech]; *Greater New Orleans Broadcasting Assn., Inc. v. United States, supra,* 527 U.S. at p. 187 [invalidating statute that prohibited advertising of lawful casino gambling, noting that "[w]hatever its character in 1934 when [the statute] was adopted, the federal policy of discouraging gambling in general, and casino gambling in particular, is now decidedly equivocal"].)

Even if we consider advances in technology, the improvements made in fax machines over the past decade have not rendered the TCPA constitutionally obsolete. In 2002, the California Legislature repealed the state's restrictions on unsolicited fax advertisements, not because the problem had gone away, but because the TCPA provided adequate remedies for an *ongoing* problem. As explained in an August 27, 2002 report by the California Senate Committee on Business and Professions, unsolicited fax advertisements were still a major concern:

"The letter of support from the Office of the [California] Attorney General states that in light of the costs and inconvenience of unsolicited faxed advertisements to consumers and businesses alike, it makes sense to repeal California's junk fax law and rely solely on the federal law which will provide greater protection for California consumers and businesses.

"In their letter of support, Food for Humans (a retail grocer) states that their corporation relies heavily on their fax machines for ordering, product information and correspondence. Daily, their tasks are interrupted by unknowns pushing their products and services through faxes. Sometimes Food for Human's communications are completely broken by these inconsiderate intruders. They feel that it is as though strangers invade their office and take control, and in a sense that is exactly what happens—again on a daily basis. They recently conducted a yearend cost analysis and it was reported that they spent well over $300.00 on fax toner cartridges alone. And, without a doubt, the vast majority of this resource (not to mention paper) was devoured by junk faxes.

"In their letter of support, the Privacy Rights Clearinghouse indicates that they have received numerous complaints from individuals and from business owners who are forced to pay for the toner, paper, and wear and tear on their fax machines. Their phone lines are tied up when receiving these solicitations .... The Privacy Rights Clearinghouse states that they have been contacted by individuals complaining about junk faxes who have tried to contact the 800 numbers on the advertisements but have found these numbers to be virtually useless. These

numbers are apparently busy, or no one answers." (Sen. Com. on Business and Professions, Analysis of Assem. Bill No. 2944, *supra*, pp. 6–7.)

The California Senate Committee also noted: "[U]nlike billboard, radio, TV, newspaper, magazine, or even direct mail—where the advertiser pays for the ad—junk faxes force each and every recipient to foot the bill by paying for the paper and toner used to print the ad on their fax machine. What's more, small businesses and self-employed people with limited resources and few telephone lines to their offices are also forced to bear the cost of having their business interrupted while their fax line is occupied receiving unsolicited fax advertisements. Companies that try to get off of junk fax lists face further productivity losses, as employees spend time calling junk fax senders in an attempt to get removed from junk fax lists." (Sen. Com. on Business and Professions, Analysis of Assem. Bill No. 2944, *supra*, at pp. 5–6.)

Today, as in 1991, the country faces a serious problem posed by unsolicited fax advertisements. Congress has addressed the problem by enacting the TCPA, which can be enforced by the FCC, state attorneys general, and, in California, private citizens. The Act continues to serve a substantial governmental interest in maintaining the free flow of commercial information.

■ We therefore decide, as have other courts, that, under *Central Hudson*, a substantial governmental interest supports the TCPA. (See *Missouri ex rel. Nixon v. American Blast Fax, Inc.*, *supra*, 323 F.3d at pp. 654–655; *Destination Ventures, Ltd. v. F.C.C.* (D.Or. 1994) 844 F.Supp. 632, 635–637, affd. (9th Cir. 1995) 46 F.3d 54; *Texas v. American Blastfax, Inc.*, *supra*, 121 F.Supp.2d at pp. 1091–1092.)

b. *Direct and Material Advancement*

We further conclude that the TCPA directly and materially advances the stated governmental interests, namely, preventing cost shifting and permitting fax machine owners to control the operation of their machines.

Defendants contend the TCPA does not sufficiently serve any governmental interest because noncommercial faxes—those that tell jokes, convey political messages, or list job opportunities—are not restricted and thus freely allowed. Defendants point out that noncommercial faxes, like fax advertisements, result in cost shifting to the recipient and interfere with the operation of the fax machine.

But the reason for this distinction is quite simple: When Congress addressed the issue of unsolicited faxes, the evidence indicated that the source

of the problem was *advertisements that offered "all kinds of products and services."* (Remarks of Sen. Hollings, *supra*, 137 Cong. Rec. 18123, italics added.) At the time, faxes advertised a wide range of things: cruises, home products, draperies, submarine sandwiches, and investment opportunities, just to name a few. (See *ibid.*; Telemarketing Practices: Hearing before House Com. on Energy and Commerce, Subcom. on Telecommunications and Finance, on H.R. Nos. 628, 2131, and 2184, *supra*, at p. 55.) The legislative history is replete with references to fax "advertising" as the culprit.

The Ninth Circuit has explained that "[b]ecause Congress's goal was to prevent the shifting of *advertising* costs, limiting its regulation to faxes containing *advertising* was justified. The ban is even-handed, in that it applies to commercial solicitation by any organization, be it a multinational corporation or the Girl Scouts." (*Destination Ventures, Ltd. v. F.C.C., supra*, 46 F.3d at p. 56, italics added; see 47 C.F.R. § 64.1200 (2003) [no exemption for nonprofit organizations with respect to unsolicited faxes].)

The Eighth Circuit reached the same conclusion, finding that the TCPA's distinction between (prohibited) advertising and (permitted) noncommercial faxes "is relevant to the goal of reducing the costs and interference associated with *unwanted* faxes." (*Missouri ex rel. Nixon v. American Blast Fax, Inc., supra*, 323 F.3d at p. 656, italics in original.) The court upheld the TCPA based in part on its conclusion that fax advertisements likely constitute the bulk of all unsolicited faxes. (See *id.* at p. 658.)

"Because Congress has addressed a substantial interest in protecting consumers from the economic harms inflicted through unsolicited advertisement faxes, ... the subsequent [restriction] of those unsolicited faxes directly [and materially] advances that interest." (*Destination Ventures, Ltd. v. F.C.C., supra*, 844 F.Supp. at p. 637; accord, *Texas v. American Blastfax, Inc., supra*, 121 F.Supp.2d at p. 1092.)

c. *Narrowly Tailored Restriction*

As the United States Supreme Court has instructed: "[T]he 'least restrictive means' test has no role in the commercial speech context.... 'What our decisions require,' ... 'is a "fit" between the legislature's ends and the means chosen to accomplish those ends,' a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served," that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.' " (*Florida Bar, supra*, 515 U.S. at p. 632, citation omitted; accord, *Lorillard Tobacco Co. v. Reilly, supra*, 533 U.S. at

p. 556.) If alternative channels permit communication of the restricted speech, the regulation is more likely to be considered reasonable. (See *Florida Bar, supra,* 515 U.S. at pp. 632–634; *Liquormart, supra,* 517 U.S. at pp. 528–530 (conc. opn. of O'Connor, J.).)

At least six federal courts, including the Eighth and Ninth Circuits, have addressed whether the TCPA's fax restrictions violate the First Amendment and have concluded that, under *Central Hudson,* the Act is narrowly tailored to achieve the government's interests (*Missouri ex rel. Nixon v. American Blast Fax, Inc., supra,* 323 F.3d at p. 658; *Destination Ventures, Ltd. v. F.C.C., supra,* 46 F.3d at pp. 56–57; *Destination Ventures, Ltd. v. F.C.C., supra,* 844 F.Supp. at pp. 637–639; *Texas v. American Blastfax, Inc., supra,* 121 F.Supp.2d at p. 1092; *Kenro, Inc. v. Fax Daily, Inc.* (S.D.Ind. 1997) 962 F.Supp. 1162, 1167–1169 *(Kenro); (Minnesota v. Sunbelt Communs. & Mktg., supra,* 2002 U.S. Dist. LEXIS 18990, at pp.\*20–\*23).

The parties' briefs focus in large part on the federal district court decision in *Missouri ex rel. Nixon v. American Blast Fax, Inc.* (E.D.Mo. 2002) 196 F.Supp.2d 920, which held that the TCPA violates the First Amendment. On March 21, 2003, after the parties had filed their briefs, the Eighth Circuit reversed the district court (*Missouri ex rel. Nixon v. American Blast Fax, Inc., supra,* 323 F.3d 649), concluding that the TCPA is valid under the *Central Hudson* test.

On a similar point, we note that various parties in the present case have relied on the record in *Missouri ex rel. Nixon v. American Blast Fax, Inc., supra,* 196 F.Supp.2d 920. But the trial court here ruled that such evidence was inadmissible, and there has been no showing on appeal that the court abused its discretion. (See *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1078 [124 Cal.Rptr.2d 142, 52 P.3d 79] [trial court's evidentiary rulings reviewed for abuse of discretion].) We therefore do not consider the proffered evidence.

Defendants suggest several alternatives to the TCPA's restrictions on unsolicited fax advertisements: permit the sending of advertisements during nonbusiness hours only, create and maintain a nationwide or statewide "do not fax" list, restrict the length or frequency of fax advertisements, require that an unsolicited fax advertisement contain a toll-free telephone number that the recipient could use to avoid further faxes, and allow faxes to all consumers unless they contact the particular advertiser and object.

As one court has explained: "A properly tailored restriction 'focuses on the source of the evils the [government] seeks to eliminate ... and eliminates them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils.' ... [The TCPA] is

not an 'unqualified prohibition' on the transmission of commercial speech via fax machine; advertisers are only prohibited from using fax machines to transmit advertising material to other fax machines when the recipient has neither invited nor given permission for such transmission....

"[The defendant's] comparison of unsolicited fax advertisements to mail, television and newspaper advertisements is unavailing for the simple reason that the latter forms of advertising impose no costs on [unwitting] consumers. Television and newspaper ads are never 'unsolicited,' since television viewers and newspaper readers must voluntarily turn on the television or read the newspaper in order to 'receive' the advertisements, and a recipient of direct mail advertising, unlike recipients of unsolicited fax advertisements, is not forced to assume any of the costs of producing those advertisements, nor does the use of his mailbox ... interfere with receipt of legitimate business mail.

"Furthermore, the mere existence of 'some imaginable alternative that might be less burdensome on speech' does not mean that the [chosen] restriction is not narrowly tailored for purposes of First Amendment analysis.... The requirement that a regulation be narrowly tailored to the government's asserted substantial interest does not mean that the regulation employ the 'least restrictive means' available....

"[T]he TCPA is narrowly tailored to the government's asserted interest in protecting consumers from the unfair shifting of advertising costs and from interruption of their use of their own fax machines ...." (*Kenro, supra,* 962 F.Supp. at pp. 1168–1169, citation and fn. omitted.)

"While it is true that the effect of [the] TCPA will be that some consumers will not receive unsolicited advertisements they might have appreciated, under the approach advocated by [defendants] there would always be individuals suffering costs and interference from unwanted advertisements. It was not [unconstitutional] for Congress to choose a system that protects those who would otherwise be forced to bear unwanted burdens over those who wish to send and receive unsolicited fax advertising. Given the cost shifting and interference imposed by unsolicited commercial faxes and the many alternatives left available to advertisers, [the] TCPA's approach is ' "in proportion to the interest served ... [and is] narrowly tailored to achieve the desired objective." ' " (*Missouri ex rel. Nixon v. American Blast Fax, Inc., supra,* 323 F.3d at p. 659.)

Defendants' reliance on *Cincinnati v. Discovery Network, Inc.* (1993) 507 U.S. 410 [123 L.Ed.2d 99, 113 S.Ct. 1505] (*Discovery Network*) is misplaced. There, the city allowed the distribution of commercial and noncommercial publications through freestanding newsracks located on public

property but decided to end the distribution of commercial publications. The city's decision was motivated by its interest in the safety and attractiveness of its streets and sidewalks. The effect of the city's action was to remove 62 newsracks, leaving approximately 1,500 to 2,000 in place.

The Supreme Court, applying the *Central Hudson* test, held that the city's action violated the First Amendment. As the court explained: "The city argues that there is a close fit between its ban on newsracks dispensing 'commercial [material]' and its interests in safety and esthetics because every decrease in the number of such dispensing devices necessarily effects an increase in safety and an improvement in the attractiveness of the cityscape. In the city's view, the prohibition is thus *entirely* related to its legitimate interests in safety and esthetics.

"We accept the validity of the city's proposition, but consider it an insufficient justification for the discrimination against [the commercial publishers'] use of newsracks that are no more harmful than the permitted newsracks, and have only a minimal impact on the overall number of newsracks on the city's sidewalks.... [¶] ... [¶]

"... Not only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and noncommercial speech, but in this case, the distinction bears no relationship *whatsoever* to the particular interests that the city has asserted. It is therefore an impermissible means of responding to the city's admittedly legitimate interests." (*Discovery Network, supra,* 507 U.S. at pp. 418–424, italics in original.)

Unlike the government action in *Discovery Network,* which did not sufficiently further the city's interests, the TCPA rests on a reasonable fit between the government's ends and means: The governmental interests in preventing the unfair shifting of advertising costs to unwitting consumers and in permitting consumers to control their fax machines are accomplished by prohibiting the sending of fax advertisements to consumers without their consent. (See *Destination Ventures, Ltd. v. F.C.C., supra,* 844 F.Supp. at p. 639; *Kenro, supra,* 962 F.Supp. at p. 1168.)

Nor do defendants fare any better under *Liquormart, supra,* 517 U.S. 484. In that case, Rhode Island had prohibited the advertising of the retail price of alcoholic beverages to the customer except at the place of sale. The purpose of the prohibition was to promote temperance by increasing the cost of alcoholic beverages. The court unanimously declared the statute unconstitutional.

Justice Stevens wrote, "[A]lternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's

goal of promoting temperance.... [H]igher prices can be maintained either by direct regulation or by increased taxation.... Per capita purchases could be limited as is the case with prescription drugs. Even educational campaigns ... might prove to be more effective." (*Liquormart, supra,* 517 U.S. at p. 507 (lead opn. of Stevens, J., with whom Kennedy, Souter, and Ginsburg, JJ., joined), citation omitted.) Justice O'Connor made similar observations. (*Id.* at pp. 529–531 (conc. opn. of O'Connor, J., with whom Rehnquist, C. J., Souter and Breyer, JJ., joined.)

Unlike the loose connection between the government's ends and means in *Liquormart,* the suggested alternatives in this case " 'fail to establish that the legislation Congress [enacted] is improperly tailored for its targeted goal.' " (*Kenro, supra,* 962 F.Supp. at p. 1169.) In addition, the TCPA does not prevent advertisers from marketing their goods and services in a myriad of ways: television, radio, newspapers, magazines, billboards, mailings, the Yellow Pages, the Internet, and telephone calls as permitted by law, and faxes to consenting consumers. As stated, "If alternative channels permit communication of the restricted speech, the regulation is more likely to be considered reasonable." (*Liquormart, supra,* 517 U.S. at 529–530 (conc. opn. of O'Connor, J.), citing *Florida Bar, supra,* 515 U.S. at pp. 632–634.)

In a closely related argument, defendants contend the TCPA is invalid under the First Amendment doctrine of overbreadth. "The showing that a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep,' ... suffices to invalidate *all* enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression' ....

"... Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech ...—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas. Overbreadth adjudication, by suspending *all* enforcement of an overinclusive law, reduces these social costs caused by the withholding of protected speech.

"[H]owever, there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law—particularly a law that reflects 'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.' ... For there are substantial social costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct. To

ensure that these costs do not swallow the social benefits of declaring a law 'overbroad,' we have insisted that a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications ... before applying the 'strong medicine' of overbreadth invalidation ...." (*Virginia v. Hicks* (2003) 539 U.S. 113 [156 L.Ed.2d 148, 123 S.Ct. 2191, 2196–2197], citations omitted.)

We conclude that the overbreadth doctrine does not apply. The TCPA does not punish a substantial amount of protected speech. It does not punish protected speech in any amount. Nor is there a basis for invalidating *all* enforcement of the TCPA's restrictions on unsolicited fax advertisements. No one will choose to abstain from protected speech if this litigation is allowed to go forward, even if it results in a plaintiff's verdict. The uninhibited marketplace of ideas will remain unaffected. And the social costs of declaring the TCPA overbroad would greatly exceed its plainly legitimate applications. (See *Van Bergen v. State of Minn.*, *supra*, 59 F.3d at pp. 1549–1550.)

### 2. *Vagueness*

Defendants argue that, on its face, the TCPA is void for vagueness. In particular, they attack the following italicized words that appear in the statutory definition of "unsolicited advertisement": "any material *advertising the commercial availability or quality of any property, goods, or services* which is transmitted to any person without that person's prior express invitation or permission." (47 U.S.C. § 227(a)(4), italics added.) Defendants thus focus on the meaning of "advertisement."

" '[A] law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits....' " (*Chicago v. Morales* (1999) 527 U.S. 41, 56 [144 L.Ed.2d 67, 119 S.Ct. 1849].) "Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." (*Maynard v. Cartwright* (1988) 486 U.S. 356, 361 [100 L.Ed.2d 372, 108 S.Ct. 1853].)

"The void-for-vagueness doctrine reflects the principle that 'a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' ... The requirement that government articulate its aims with a reasonable degree of clarity ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values, reduces the danger of caprice and discrimination in the administration of the laws,

enables individuals to conform their conduct to the requirements of law, and permits meaningful judicial review." (*Roberts v. United States Jaycees* (1984) 468 U.S. 609, 629 [82 L.Ed.2d 462, 104 S.Ct. 3244], citation omitted.)

Defendants " 'must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.' ... [They must] demonstrate ' "that no set of circumstances exists under which the [statute] would be valid." ' ... Our Supreme Court has put it even more plainly: 'a claim that a law is unconstitutionally vague can succeed only where the litigant demonstrates ... that the law is ... "impermissibly vague in all of its applications." ' ... A facial challenge must fail if courts can conceive of a single situation in which the legislative enactment can be constitutionally applied.... Success comes only if the challenger demonstrates that the law is uncertain 'under any and all circumstances.' " (*Personal Watercraft Coalition v. Marin County Bd. of Supervisors* (2002) 100 Cal.App.4th 129, 138 [122 Cal.Rptr.2d 425], citations and italics omitted; accord, *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1200–1201 [246 Cal.Rptr. 629, 753 P.2d 585].)

In *Kaufman, supra,* No. BC222588, plaintiffs propounded requests for admissions, asking defendants DataMart and ACS Systems, Inc., to admit that ACS Systems had asked DataMart to transmit "advertisements," as that term is defined in the TCPA. Both defendants answered in the affirmative. Given that defendants knew the meaning of "advertisement" in responding to discovery about their own conduct, it is unlikely that they were ever in the dark.

In *Amkraut, supra,* No. BC240573, plaintiffs attached two fax advertisements to the complaint, both of which announced that Pacific Coast Office Products was having a "Factory Blowout Sale," displayed an illustration of a photocopy machine, and listed the names of 13 well-known manufacturers of office products, among them, "brother," Xerox, and Canon. Anyone of common intelligence would instantly recognize the faxes as "advertisements."

Defendants have failed to show that the meaning of the TCPA "is uncertain 'under any and all circumstances.' ..." (*Personal Watercraft Coalition v. Marin County Bd. of Supervisors, supra,* 100 Cal.App.4th at p. 139, italics omitted.) ▪ We therefore reject defendants' contention that the Act is void for vagueness.

### 3. *Excessive Damages*

The TCPA provides that a defendant, if found liable, must compensate the plaintiff for actual monetary loss per violation or $500 in damages, whichever

is greater. Willful or knowing violations may result in treble damages. (See 47 U.S.C. § 227 (b)(3).) Defendants argue that this damages provision violates the due process clause of the Fifth and Fourteenth Amendments because it is grossly disproportionate to any harm suffered by a plaintiff. (Defendants expressly disclaim any reliance on the excessive fines clause of the Eighth Amendment. [(See *Browning-Ferris Industries v. Kelco Disposal* (1989) 492 U.S. 257, 264 [106 L.Ed.2d 219, 109 S.Ct. 2909].)]) We find no due process violation.

For one thing, the trial court in this case has not proposed or imposed damages in any amount. Liability has not even been determined. And although a willful or knowing violation of the TCPA *permits* an award of treble damages, the trial court has *discretion* in awarding damages that exceed the actual monetary loss or $500 per violation. The court may award treble damages or something less, including no additional damages. Because damages have not been awarded in this case, defendants cannot succeed in challenging the damages provisions as applied. That challenge is not ripe. (See *Hodel v. Virginia Surface Mining & Recl. Assn.* (1981) 452 U.S. 264, 303–304 [69 L.Ed.2d 1, 101 S.Ct. 2352]; *Ameri-Medical Corp. v. Workers' Comp. Appeals Bd.* (1996) 42 Cal.App.4th 1260, 1285–1286 [50 Cal.Rptr.2d 366]; *Ziaee v. Vest* (7th Cir. 1990) 916 F.2d 1204, 1210–1211.)

Defendants also fail in challenging the damages provisions on their face. "A statutory penalty violates due process 'only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.' ...

"[T]he TCPA damages provision was not designed solely to compensate each private injury caused by unsolicited fax advertisements, but also to address and deter the overall public harm caused by such conduct.... [T]he TCPA was meant to [(1)] 'take into account the difficult[y] [of] quantify[ing] [the] business interruption costs imposed upon recipients of unsolicited fax advertisements, [(2)] effectively deter the unscrupulous practice of shifting these costs to unwitting recipients of "junk faxes," and [(3)] "provide adequate incentive for an individual plaintiff to bring suit on his own behalf." ' ... [S]tatutory damages designed to address such 'public wrongs' need not be 'confined or proportioned to [actual] loss or damages; for, as it is imposed as a punishment for the violation of a public law, the Legislature may adjust its amount to the public wrong rather than the private injury....'....

"... Congress identified two legitimate public harms addressed by the TCPA's ban on junk faxes: (1) unsolicited fax advertisements can substantially interfere with a business or residence because fax machines generally

can handle only one message at a time, at the exclusion of other messages; and (2) junk faxes shift nearly all of the advertiser's printing costs to the recipient of the advertisement.... [T]he TCPA's $500 minimum damages provision, when measured against the overall harms of unsolicited fax advertising and the public interest in deterring such conduct, is not 'so severe and oppressive as to be wholly disproportioned to the offense or obviously unreasonable.' " (*Texas v. American Blastfax, Inc.*, *supra*, 121 F.Supp.2d at pp. 1090–1091.)

As another federal court has stated: "[I]n mathematical terms, a $500 penalty for violation of the TCPA is not so high in relation to actual damages as to violate the Due Process clause.... [E]ven if the actual monetary costs imposed by advertisers upon the recipients of unsolicited fax advertisements [are] small when compared to the $500 minimum penalty for such conduct, that penalty is not so 'severe and oppressive' as to run afoul of the Due Process clause." (*Kenro*, *supra*, 962 F.Supp. at pp. 1166–1167; accord, *ESI Ergonomic Solutions v. United Artists* (2002) 203 Ariz. 94, 100 [50 P.3d 844, 850] (*ESI Ergonomic Solutions*) ["penalty is not so disproportionate to actual damages as to violate due process"].)

C. *Class Action*

"Courts long have acknowledged the importance of class actions as a means to prevent a failure of justice in our judicial system.... ' "By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides *small claimants* with a method of obtaining redress ...." ' ... Generally, a class suit is appropriate 'when numerous parties suffer *injury of insufficient size to warrant individual action* and when denial of class relief would result in unjust advantage to the wrongdoer.' ...

"Section 382 of the Code of Civil Procedure authorizes class suits in California when 'the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court.' To obtain certification, a party must establish the existence of both an ascertainable class and a well-defined community of interest among the class members.... The community of interest requirement involves three factors: '(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' ...

"Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th

429, 434–436 [97 Cal.Rptr.2d 179, 2 P.3d 27] (*Linder*), italics added, citations omitted; accord, *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096 [131 Cal.Rptr.2d 1, 63 P.3d 913].)

In the present case, defendants argue that a class action is never permitted under the TCPA because Senator Hollings, the sponsor of the Act, expressed his hope that "States will make it as easy as possible for consumers to bring [TCPA] actions, preferably in *small claims court*." (Remarks of Sen. Hollings, *supra*, 137 Cong. Rec. 30821 italics added.) But the senator also said, "The [Act] does not, because of constitutional constraints, dictate to the States which court in each State shall be the proper venue for such an action, as this is a matter for State legislators to determine." (*Ibid.*) The senator "expect[ed] that the States [would] act reasonably in permitting their citizens to go to court to enforce this [Act]." (*Id.* at p. 30822.)

"[W]hen a state court hears a case brought under a federal law, local laws control procedure, jurisdiction, administration, and venue. It is often said that 'federal law takes the state courts as it finds them,' ... [¶] The particulars of a TCPA case (jurisdiction, venue, residency, amount in controversy, etc.) must fit the administrative and jurisdictional rules of the state court hearing the case. The Supremacy Clause does not reach these administrative and procedural issues .... Congress cannot command which court in a state has jurisdiction over TCPA claims. Nor can it mandate the 'modes of procedure' ...." (Biggerstaff, *State Court and the Telephone Consumer Protections Act of 1991: Must States Opt-In? Can States Opt-Out?*, *supra*, 33 Conn. L.Rev. at p. 431, fns. omitted; accord, *Howlett v. Rose* (1990) 496 U.S. 356, 372 [110 L.Ed.2d 332, 110 S.Ct. 2430].)

A class action in superior court would fulfill Senator Hollings's expectations. A class action, like a dispute in small claims court, would provide "small claimants" with proper redress. (See *Linder*, *supra*, 23 Cal.4th at p. 435.) Further, a class action would enable attorneys (who are not allowed to represent parties in small claims court) to obtain relief for numerous individuals who have suffered an injury of insufficient size to warrant separate lawsuits. (See *ibid.*) And although attorneys would represent the plaintiffs in a class action, attorneys' fees would not deprive individuals of adequate remedies because the trial court would play an active role in making sure that the amount of fees is reasonable. (See *Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 254–255 [110 Cal.Rptr.2d 145]; *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1800–1801, 1807–1810 [56 Cal.Rptr.2d 483].)

"[T]he benefits of [class] certification are not measured by reference to individual recoveries alone. Not only do class actions offer consumers a means of recovery for modest individual damages, but such actions often produce 'several salutary by-products, including a therapeutic effect upon those sellers who indulge in fraudulent practices, aid to legitimate business enterprises by curtailing illegitimate competition, and avoidance to the judicial process of the burden of multiple litigation involving identical claims.' " (*Linder, supra,* 23 Cal.4th at p. 445.)

 Accordingly, we agree with the trial court that the TCPA does not foreclose class actions. But that does not mean that every TCPA action should proceed as one. The courts appear divided on the issue. In *Hooters of Augusta, Inc. v. Nicholson, supra,* 245 Ga.App. 363 [537 S.E.2d 468], the Georgia Court of Appeals affirmed the trial court's certification of a class, deferring to the trial court's exercise of discretion.

In *ESI Ergonomic Solutions, supra,* 203 Ariz. 94 [50 P.3d 844], the trial court denied a motion to certify a class, in part because the court considered the potential damages to be too high—between $45 million and $135 million. The Arizona Court of Appeals reversed, stating:

"The [trial] court's ruling evinces a greater concern with the fairness of the consequences to the defendants should a plaintiff class prevail than with the procedural fairness of adjudicating the matter through a class action versus some other method. We agree with [plaintiff] that the fairness of the statutory penalty for the specific form of violation alleged here has been decided by Congress in enacting the law and that the court's determination that it would be unfair is an improper consideration in deciding whether a class action is the superior method of adjudication.

"Congress made a legislative determination that the appropriate penalty for violating [the TCPA] was $500 per violation or, in the court's discretion, $1,500 per willful violation.... In doing so Congress established a penalty designed not only to compensate for the actual damages and unquantifiable harm, but also to deter the offensive conduct....

"Having provided for a private right of action and having decided the appropriate penalty, Congress did not preclude the use of class actions to obtain redress for violations.... Class action relief is unavailable only if Congress expressly excludes it ..., and Congress has done so in some statutes.... Congress provided no express exclusion of class action relief in [the TCPA].

"Given that Congress determined the per-violation penalty and allowed for the pursuit of class actions under the statute, it is not for the court to determine that the penalty when applied in a class action context is unfair. The fairness of statutory punishment, within due process concerns, is properly determined by the legislature....

"That 'ruinous or annihilating' damages should not be considered in the [class action] analysis is particularly compelling in circumstances such as this, where the size of the class, and therefore, the potential class liability, is entirely within the control of the defendants. To deny [a motion to certify] a class action because the size of the class made the damages annihilating, would serve to encourage violation of the statute on a grand rather than a small scale." (*ESI Ergonomic Solutions, supra*, 203 Ariz. at pp. 100–101 [50 P.3d at pp. 850–851], citations omitted.)

On the other hand, in *Forman v. Data Transfer, Inc.* (E.D.Pa. 1995) 164 F.R.D. 400, the federal district court denied a motion to certify a class on the ground that "[t]he gravamen of plaintiff's complaint is not a common course of conduct by the defendant, but rather a series of individual transmissions under individual circumstances, each of which is an alleged violation of the [TCPA]. Lacking a single set of operative facts, it is difficult to see how common questions, if any, predominate [over individual ones]." (*Id.* at p. 404.)

In *Kenro, supra*, 962 F.Supp. 1162, the district court denied certification because "[the plaintiff's] class definition would require the court to conduct individual inquiries with regard to each potential class member in order to determine whether each potential class member had invited or given permission for the transmission of the challenged fax advertisements ...." (*Id.* at p. 1169; accord, *Livingston v. U.S. Bank* (Colo.Ct.App. 2002) 58 P.3d 1088.)

■ In sum, the propriety of a class action should be decided on a case-by-case basis, depending upon whether there is an ascertainable class and a well-defined community of interest among the purported class members.[4]

---

[4] As stated in the trial court's 18-page statement of decision, the parties agreed to limit their demurrers and motions for summary judgment and summary adjudication to three issues: (1) whether the TCPA affords a private right of action that may be pursued in California state courts; (2) the constitutionality of the TCPA; and (3) the availability of class actions under the TCPA. We do not reach any questions outside the scope of the parties' agreement, including whether: (1) defendants are liable under the TCPA even though they are fax broadcasters, not advertisers; (2) the transmission of advertisements to computers is unlawful; and (3) defendants may be held liable under any law other than the TCPA, such as the California unfair competition law (Bus. & Prof. Code, §§ 17200–17209) and the common law.

## III

## DISPOSITION

The judgment from which the appeals are taken is reversed. Appellants are entitled to costs on appeal.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.

Respondents' petition for review by the Supreme Court was denied October 15, 2003. Baxter, J., did not participate therein.